# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| BILLY WAYNE HUFFMAN, | § | |
| (TDCJ-CID #1188783) | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-06-0308 |
| | § | |
| LANNETTE C. LINTHICUM, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

Billy Wayne Huffman, an inmate of the Texas Department of Criminal Justice -
Correctional Institutions Division ("TDCJ-CID"), sued in January 2006, alleging civil
rights violations resulting from a denial of dental care. Huffman, proceeding *pro se*
and *in forma pauperis*, sues Dr. Lannette C. Linthicum, Director of TDCJ-CID Health
Services Division; Dr. Albert D. Wells, Dental Director at the University of Texas
Medical Branch - Correctional Managed Care ("UTMB-CMC"); Dr. Jerry Don Toole,
Cluster Dental Director at UTMB-CMC; and John Doe, dentist at the Lindsay Unit.
On October 17, 2006, this court found that this civil action lacked an arguable basis
in law, and dismissed Huffman's claims with prejudice under 28 U.S.C.
§ 1915A(b)(1). (Docket Entry No. 9). On February 6, 2008, the United States Court
of Appeals for the Fifth Circuit found that because Dr. Toole had not responded to

O:\RAO\VDG\2006\06-0308.b01

Huffman's complaint, and it was possible that Dr. Toole knew of and disregarded Huffman's serious medical need, Huffman's claim against Dr. Toole was not frivolous and was not appropriate for dismissal. The Fifth Circuit also stated that even if Huffman failed to allege facts suggesting overt personal participation by Dr. Wells and Dr. Linthicum, this court did not address whether any of the Defendants implemented a policy which itself deprived Huffman of his constitutional rights. The Fifth Circuit affirmed this court's dismissal of Huffman's claims against an unknown dentist. The Fifth Circuit reversed this court's judgment regarding Huffman's remaining claims and remanded the case for further proceedings. (Docket Entry No. 20).

On April 7, 2008, this court entered an order for service of process as to the three remaining Defendants. (Docket Entry No. 22). Dr. Linthicum, Dr. Wells, and Dr. Toole filed a motion for partial dismissal on May 19, 2008. (Docket Entry No. 24). On June 4, 2008, Huffman filed a motion for extension of time. (Docket Entry No. 26). On August 18, 2008, Dr. Linthicum, Dr. Wells, and Dr. Toole filed their motion for summary judgment. (Docket Entry No. 29). On October 23, 2008, this court granted Huffman an extension until December 5, 2008, to file his response. (Docket Entry No. 30). On November 14, 2008, Huffman filed a second motion for extension stating that he has a second-grade reading level and a third-grade

comprehension level.  He states that he currently resides in a TDCJ pre-release facility and is having difficulty finding legal assistance.  He seeks an additional extension of sixty days so that he can retain counsel once he is released on parole. (Docket Entry No. 31).  This court cannot prolong adjudication of this civil action indefinitely.  Several months have elapsed since the Defendants filed their dispositive motions.  This court has previously granted an extension of time of ninety days. Huffman states that he was released on parole on November 19, 2008.  (Docket Entry No. 32).  He has had sufficient time to seek assistance or to try to prepare a response on his own.  Huffman's second motion for extension is denied.  The court will liberally construe the pleadings filed by Huffman as his response.

Based on the pleadings, the motion, the summary judgment record, and the applicable law, this court grants the Defendants' partial motion to dismiss and motion for summary judgment.  Final judgment is entered by separate order.  The reasons for these rulings are stated below.

## I.    Huffman's Allegations

Huffman complains that on March 7, 2003, the TDCJ-CID implemented a policy of denying dentures and partial dentures to inmates if they were not medically necessary.  While Huffman was confined at the Middleton Unit, the dental clinic extracted nine of his teeth on September 23, 2003.  In October 2003, Huffman was

transferred to the Lindsay Unit where the dental clinic extracted six additional teeth. Dental personnel at both the Middleton and Lindsay Units told Huffman that his missing teeth would be replaced with dentures. Before any dentures could be ordered, Huffman was transferred to the Wynne Unit in September 2004.

On January 4, 2005, Huffman asked Dr. Toole about extracting one tooth that was cutting into Huffman's gum. Noting that Huffman had only three teeth, Dr. Toole asked Huffman to sign a written consent form authorizing the extraction of teeth. Although Huffman had trouble reading, he signed the document. Dr. Toole extracted all of Huffman's remaining teeth. Dr. Toole told Huffman that Huffman would not receive dentures because he did not meet the criteria for receiving dentures. Dr. Toole noted that Huffman looked good and that Huffman's health appeared to be good.

Huffman complains that he has no teeth and dental personnel refused him dentures. Without any teeth, Huffman has experienced intense physical pain; swollen gums; problems with masticating or chewing; was forced to improvise a soft food diet without medical supervision; headaches; weight loss; humiliation; disfigurement; pain in his stomach; and depression. Huffman states that the delay in providing him dentures will exacerbate serious, unspecified medical problems. Huffman asserts that he faces an increased risk of premature death as a result of not having dentures.

Huffman asserts that Dr. Linthicum approved the contract between TDCJ-CID and UTMB.  Dr. Wells was responsible for the day-to-day delivery and treatment of dental care.  Dr. Wells and Dr. Toole were responsible for the implementation of policies governing dental care for inmates.

Huffman seeks a declaratory judgment that the Defendants' policies and practices are unconstitutional; preliminary and permanent injunctions preventing the Defendants from denying him dentures; and punitive damages of $125.00 per day for each day he was denied dentures.

The Defendants move for summary judgment on Huffman's claims of deliberate indifference.  The claims and challenges are addressed below.

## II.    The Defendants' Partial Motion to Dismiss

The Defendants have filed a partial motion to dismiss, (Docket Entry No. 24), arguing that some of Huffman's claims are barred by the applicable statute of limitations.

The Supreme Court recently clarified the standard that applies to a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ----, 127 S.Ct. 1955, 1964 (2007), the Court stated that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.

R. CIV. P. 8(a)(2).  A court must not dismiss a complaint for failure to state a claim unless the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 127 S. Ct. at 1974; *Sonnier v. State Farm Mut. Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1974). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief-including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1964-65); *see also Sonnier*, 509 F.3d at 675 (quoting *Twombly*, 127 S. Ct. at 1965).  "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Cuvillier*, 503 F.3d at 401 (quoting *Twombly*, 127 S. Ct. at 1966) (internal quotations omitted).

The Defendants are entitled to make their argument based on limitations in their 12(b)(6) motion to dismiss because a complaint that shows relief to be barred by the statute of limitations may properly be dismissed for failure to state a cause of action. *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982); *see Doe v. Linam*, 225 F. Supp.2d 731, 734 (S.D.

Tex. 2002) ("A Rule 12(b)(6) motion to dismiss for failure to state a claim is the proper vehicle by which to assert a limitations defense where a plaintiff's complaint shows affirmatively that his claims are time-barred.") (citing *Herron v. Herron*, 255 F.2d 589, 593 (5th Cir. 1958)).

There is no federal statute of limitations for 42 U.S.C. § 1983 actions; the relevant statute of the forum state furnishes the limitations period, but federal law determines the date the accrual commences. *Owens v. Okure*, 488 U.S. 235 (1989). In Texas, the statute of limitations for personal injury claims is two years. TEX. CIV. PRAC. & REM. CODE § 16.003(a) (Vernon 2007) (requiring that a person bring suit for "trespass for injury to the estate or to the property of another, conversion of personal property, taking or detaining the personal property of another, personal injury, forcible entry and detainer, and forcible detainer not later than two years after the day the cause of action accrues"). Under the federal standard, "a cause of action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Harris v. Hegmann*, 198 F.3d 153, 156-57 (5th Cir. 1999)(quoting *Burrell v. Newsome*, 883 F.2d 416, 418 (5th Cir. 1989)). The plaintiff must be in possession of "critical facts" which indicate that he has been hurt and that the Defendants were responsible for the injury. *Stewart v. Parish of Jefferson*, 951 F.2d 681, 684 (5th Cir.) *cert. denied*, 506 U.S. 820 (1992). A plaintiff need not

realize that a legal cause of action exists, but must know the facts that would support a claim. *Piotrowski v. City of Houston,* 51 F.3d 512, 516 (5th Cir. 1995).

Huffman complains of the denial of proper dental care that began in September 2003 and continues to the present. Huffman did not file this suit until January 24, 2006. The statute of limitations bars Huffman from asserting his civil rights claims against the named Defendants based on events that took place before January 24, 2004. For example, Huffman complained that following the extraction of teeth at the Middleton and Lindsay Units in September and October 2003, dental personnel assured him that he would be provided with dentures. These claims are dismissed as barred by the statute of limitations. The Defendants' Partial Motion to Dismiss, (Docket Entry No. 24), is GRANTED.

## III.   The Defendants' Motion for Summary Judgment

### A.   The Legal Standard

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Christopher Village, L.P. v. Retsinas,* 190 F.3d 310, 314 (5th Cir. 1999). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a

O:\RAO\VDG\2006\06-0308.h01                                 8

reasonable jury could return a verdict for the nonmoving party." *Id.*; *Owsley v. San Antonio Indep. Sch. Dist.,* 187 F.3d 521, 523 (5th Cir. 1999), *cert. denied,* 120 S. Ct. 1423 (2000). A movant for summary judgment makes such a showing by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues to support the nonmovant's case. *Celotex Corporation v. Catrett,* 477 U.S. 317, 323 (1986). The pleadings, depositions, admissions, and affidavits, if any, must demonstrate that no genuine issue of material fact exists. FED. R. CIV. P. 56(c).

Once the movant makes this showing, the nonmovant may not rest on the allegations in his pleadings. *See Isquith for and on behalf of Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 199 (5th Cir.), *cert. denied,* 488 U.S. 926 (1988). Rather, he must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 324; *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 586 (1986). "Although we consider the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmovant, the nonmoving party may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial."

*Rushing v. Kansas City Southern Ry. Co.,* 185 F.3d 496, 505 (5th Cir. 1999), *cert. denied*, 120 S. Ct. 1171 (2000).

**B.      The Defendants' Summary Judgment Evidence**

In support of their motion for summary judgment, the Defendants have filed the following exhibits:

(A)    Affidavit of Dr. Jerry D. Toole, D.D.S.

Attachment 1 -Sections E-36.4 and E-36.5 of the Correctional Managed Health Care (CMC) Dental Services Manual (eff. Sept. 1, 2003)

Attachment 2 - Parameter for Care for Medically Necessary Prosthodontics, July 1, 2004;

(B)    Huffman's TDCJ Unit Medical Records;

(C)    Huffman's Additional TDCJ Unit Medical Records;

(D)    Affidavit of Dr. Brian Tucker, D.D.S.;

(E)    Affidavit of Dr. Albert D. Wells, D.D.S.;

Attachment 3 - Sections E-36.4 and E-36.5 of CMC Dental Services Manual (eff. Jan. 1, 2007)

(F)    Affidavit of Dr. Lannette Linthicum, M.D., F.A.C.P.; and

(G)    Affidavit of Dr. Owen Murray, D.O.

(Docket Entry No. 29).

The Defendants assert their entitlement to qualified immunity on the grounds that Huffman has failed to allege a constitutional violation and that the Defendants' actions were objectively reasonable in light of clearly established law. (Docket Entry No. 29, Defendants' Motion for Summary Judgment, pp. 12-14). This court analyzes the Defendants' motion and the summary judgment evidence under the applicable law.

## IV.    The Claims Against the Defendants in Their Individual Capacities

In *Siegert v. Gilley,* 500 U.S. 226 (1991), the Supreme Court held that to defeat qualified immunity, a plaintiff must allege a violation of a clearly established constitutional right. *Id.* at 231. In making this determination, the court considers currently applicable constitutional standards. *Rankin v. Klevenhagen*, 5 F.3d 103, 106 (5th Cir. 1993). If the plaintiff fails this step, the defendant is entitled to dismissal of the complaint. If the court answers the first inquiry affirmatively, then the court must decide whether the Defendants' conduct was objectively reasonable.

Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment, whether the indifference is manifested by prison doctors or by prison guards in intentionally denying or delaying access to medical care. *Harris v. Hegmann,* 198 F.3d 153, 159 (5th Cir. 1999); *Estelle v. Gamble,* 429 U.S. 97 (1976). "Deliberate

indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001). Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind. *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1999). To satisfy the exacting deliberate indifference standard, a defendant's conduct must rise "to the level of egregious intentional conduct." *Gobert v. Caldwell,* 463 F.3d 339, 351 (5th Cir. 2006).

The United States Supreme Court has adopted "subjective recklessness as used in the criminal law" as the appropriate definition of deliberate indifference under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 839-40 (1994). Under this definition, a prison official cannot be found liable under the Eighth Amendment unless the official knows of and disregards an excessive risk to inmate health or safety. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference. *Farmer,* 511 U.S. at 837. Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk. *Id; Reeves v. Collins,* 27 F.3d 174 (5th Cir. 1994). Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's

allegations of deliberate indifference. *See Varnado v. Lynaugh,* 920 F.2d 320 (5th Cir. 1991).

The courts have set a high standard to raise a fact issue as to deliberate indifference. A claim that prison medical personnel made an incorrect diagnosis does not state a claim for deliberate indifference. *Domino v. Texas Department of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001) (citing *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985)). Similarly, the decision whether to provide additional or different treatment "is a classic example of a matter for medical judgment." *Estelle,* 429 U.S. at 107. The "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer,* 511 U.S. at 838, 114 S. Ct. 1970.

"Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *Norton v. Dimizana,* 122 F.3d 286, 292 (5th Cir. 1997). Rather, the plaintiff must allege and raise a fact issue as to whether prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson,* 759 F.2d at 1238.

Dr. Toole testified as follows:

On or about September 23, 2003, Mr. Huffman was received into TDCJ-CID. According to his statement, he was received into the Middleton Unit and later to the Lindsay Unit. He was later transferred to the Wynne Unit on or about August 30, 2004. On September 9, 2004, while at the Wynne Unit, Mr. Huffman forwarded a dental sick call request (SCR) to the dental department, complaining, "I would like an update on my teeth. I'm waiting to get the rest of my teeth pulled to get some more." In response to his request, I examined him in the Wynne Dental Clinic on September 10, 2004. In the dental clinic, Mr. Huffman complained of wanting to have his tooth pulled. He was not complaining of pain, but pointed to teeth #20 and #21. Rampant caries (areas of tooth decay) were noted with no indication of swelling or infection. Teeth #20 and #21 were diagnosed as non-restorable and Mr. Huffman was given an appointment to return for extraction of these teeth. No medical problems were noted by Mr. Huffman at that appointment. There also was no indication in the clinical visit for a request to have dentures made.

On September 28, 2004, I saw Mr. Huffman at the Wynne Dental Clinic and teeth #20 and #21 were removed without incident. On November 12, 2004. Mr. Huffman forwarded another sick call request to the dental department complaining, "I would like for you to pull 2 of my teeth, cause I'm not able to eat w/them. And I have been having problems chewing w/them." On November 12, 2004, Mr. Huffman was scheduled to be seen for this complaint, but did not keep his appointment due to security concerns. He was rescheduled. On November 16, 2004, I saw and examined Mr. Huffman. He wanted to have two teeth removed and pointed to teeth #11 and #18. Teeth #11 and #18 were diagnosed as non-restorable due to mobility. Tooth #11 was extracted without incident at this appointment and patient was re-appointed for the extraction of tooth #18. On December 3, 2004, tooth #18

was extracted without incident. Mr. Huffman was not re-appointed for care.

On January 3, 2005, Mr. Huffman forwarded another sick call request to the dental department, complaining, "Could I please get an appointment with a dentist to get a bad tooth pulled?" On January 4, 2005, I saw and examined Mr. Huffman in the Wynne Dental Clinic. While the sick call request stated that Mr. Huffman needed a "bad tooth pulled," at the clinical visit he stated he wanted to talk about getting dentures made. At this visit, Mr. Huffman had only teeth #12, #13, and #22 remaining. Patient's approximate weight at the clinical visit was 193 pounds, with a body mass index (BMI) of 25. Patient was diagnosed as essentially edentulous (toothless) due to the number of missing teeth. UTMB/CMC Dental Policy concerning replacement of missing teeth with dental prostheses was explained to the patient. He was informed that he did not meet the medical criteria of "medical necessity." Mr. Huffman requested to have the remaining three teeth removed as "he could chew better without them." I agreed to extract the remaining teeth with the understanding that they would not be replaced. Mr. Huffman was re-appointed to have teeth #12, #13 and #22 removed.   Prior to his scheduled appointment, Mr. Huffman sent an additional sick call request on January 20, 2005, stating, "Please schedule me to pull my teeth A.S.A.P.  They are bothering me very bad. I can't eat with them the way they are." On January 21, 2005, Mr. Huffman was seen in the dental clinic. At this clinical visit, he stated that he was not in pain but was not sure if he was going to be scheduled to have the teeth removed. Mr. Huffman was informed that he was on the treatment schedule and would be receiving an appointment for extraction of the teeth in question. On January 25, 2005, teeth #12 and #13 were extracted by me without complication. Mr. Huffman was re-appointed for extraction of tooth #22. On April 11, 2005, Mr. Huffman forwarded another sick call request,

stating that he wanted to have his last tooth removed. On April 12, 2005, tooth #22 was extracted by me without complications.

On July 16, 2006, Mr. Huffman forwarded a sick call request to the dental department, asking for follow-up for dentures.  He stated he was having problems chewing, swallowing, and digesting his food.  On July 18, 2006, Mr. Huffman was examined in the Wynne Dental Clinic by Dr. Keith Johnson, DDS. Dr. Johnson's diagnosis was "Prosth, not medically indicated. IM has BMI of 24" which was an indication that Mr. Huffman did not qualify for dentures under policy because his BMI was 24, which is acceptable. On February 15, 2008, Mr. Huffman forwarded another sick call request, complaining, "I need to see about getting my teeth." Mr. Huffman was examined by Dr. Mehaffey, DDS on February 19, 2008.  Dr. Mehaffey indicated that Mr. Huffman did not meet the requirements for prosthetics. Mr. Huffman verbally refused a blended diet.

My decision not to provide dentures to Mr. Huffman was in accordance with policy.  UTMB/CMC Dental Policy and Procedures provide for the provision of dental prosthetics to inmate patients with compromised masticatory function when the health of the inmate would be adversely affected.  Copies of the Dental Policy E-36.4 and E-36.5, as they existed in January 2005, are attached as Attachment 1.  As explained in the parameter for care in 2004, prosthesis (dentures) provided under this policy are termed "medically necessary." A copy of the Parameter for Care for Medically Necessary Prosthodontics (effective July 1, 2004) is attached as Attachment 2.  Provision of dental prosthesis based on "medical necessity" became effective by dental directive dated March 7, 2003, and by policy on September 1, 2003.  Eligibility for medically necessary dental prosthesis is determined by the attending physician and dentist. The nutritional status of a patient having compromised masticatory function is monitored by tracking weight trends.  A review of the body mass index

(BMI) is utilized as a tracking methodology.  A BMI of 18.5 to 25 is considered normal.  A patient with a BMI of 25 or lower which is trending downward or a patient 10% or more underweight relative to his ideal body weight is referred to the patient's treating physician by the attending dentist for evaluation.  If the patient's physician determines that the patient's nutritional status is compromised, special diets such as a mechanically blended diet or high protein liquid diet are considered.  Patients should be compliant with all dietary recommendations.  Patients not responding to dietary intervention are referred to the UTMB Dental Utilization Quality Review Committee (DUQRC) to determine eligibility for medically necessary dental prosthetics. Referrals to the Committee are made utilizing the "Medically Necessary Dental Prosthetics Referral" form. The DUQRC is composed of the District Dental Directors and Dental Speciality Coordinators as assigned by the Dental Director (UTMB Policy E-36.5).  Referrals not approved by the DUQRC are automatically referred to an Appeals Committee for consideration.

Plaintiff's allegations of deliberate indifference to serious medical needs are without merit.  As shown, the dental records indicate that Mr. Huffman's requests for care were appropriately evaluated by me and the other dental staff, and we responded in a timely manner.  The dental treatment provided to Mr. Huffman was consistent with UTMB/CMC Dental Policies and Procedures.  Mr. Huffman's requests for full dentures were evaluated and responded to in accordance with UTMB/CMC Dental Policy E-36.4.  Dentures were not prescribed as Mr. Huffman's nutritional status and medical condition did not satisfy the eligibility of "medical necessity" as outlined in UTMB/CMC Dental Policy E-36.4.  His weight and body mass index during the time of my treatment interval have remained stable and within the policy's normal level of 18.5 to 25.  Mr. Huffman's nutritional status has been monitored via the electronic medical record using the Body

> Mass Index as a tracking methodology over the period of his incarceration to ensure that his overall health was not adversely affected. Plaintiff's other medical conditions were appropriately managed by medical personnel.

(Docket Entry No. 29, Defendants' Motion for Summary Judgment, Ex. A, pp. 1-6).

After reviewing Huffman's medical and dental records, Dr. Murray gave the following expert testimony:

> Our policy regarding provision of dentures is set out in the Correctional Managed Health Care Policy Manual, Policy Number E-36.4. In short, if a dentist or physician signs a form stating that the patient has a medical need for dentures, that recommendation is forwarded to a dental utilization review committee. That committee will then make a decision on whether dentures are medically necessary. In this instance, the unit dentist never indicated that there was a medical need, and so the process never moved beyond the facility.
> I am not a dentist. In developing this policy, I relied upon the expertise of dentists at Texas Tech University, who care for offenders housed at TDCJ units in the Northwest portion of the state, as well as Albert "Sonny" Wells, the Director of Dental Services for UTMB-CMC. Based upon these recommendations, I, on behalf of UTMB-CMC, approved a policy which I believe provides for adequate review of an offender's condition and the provision of dentures when a serious medical need has been established. This policy, like all of our policies, is always open for revision based upon new literature and new trends in dental care. This policy, like all of our policies, must additionally be approved not only by the head of UTMB-CMC, but also by my counterpart at Texas Tech University (currently, Dr. Denise DeShields) and the Director of the Health Services Division of the Texas Department of Criminal Justice

(currently, Dr. Lannette Linthicum). All three entities must approve of any policy.

I am familiar with the standards of medical care in Texas generally and specifically for inmates of the Texas Department of Criminal Justice - Correctional Institutions Divisions (TDCJ-CID). I have been a licensed physician for over 17 years.

. . .

Medical records show there was an approximately six week period (5-27-06 through 7-16-06) where the Plaintiff was making complaints of chewing, swallowing and digesting his food. He was evaluated by nursing, providers (a physician's assistant) and dental staff (Dr. Toole). He was provided with antacids, which apparently resolved the situation; Plaintiff made no further complaints about similar problems following that brief interval. His weight has been approximately 188 pounds, with a Body Mass Index (BMI) of approximately 24-25. The high end of a normal BMI is 24.9, so Plaintiff's BMI was appropriate. As of February, 2008, during an evaluation by Mark Mahaffey, D.D.S., Plaintiff represented that he was eating food 'fine.' It does not appear from the medical records that Plaintiff suffered from any serious medical condition.

(Docket Entry No. 29, Defendants' Motion for Summary Judgment, Ex. G, pp. 1-2).

Huffman has failed to show that Dr. Toole was aware he faced a substantial risk of serious harm and disregarded the risk by failing to take reasonable measures to abate it. In essence, Huffman's complaint constitutes nothing more than an unactionable disagreement with correctional officials over the proper course of

treatment.  Huffman has failed to show that prison officials acted with deliberate indifference to his medical needs by denying him dentures.

Nothing in the summary judgment evidence suggests that Dr. Toole was deliberately indifferent to Huffman's dental needs by refusing dentures.  Huffman has not pointed to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.

The summary judgment evidence shows that Huffman was seen by dental personnel on numerous occasions for complaints of decaying teeth; that the dental personnel evaluated his condition; and that he was provided with dental care. Dental personnel examined Huffman, performed diagnostic procedures, performed several tooth extractions, and prescribed medications.  The summary judgment evidence shows that Huffman received the following treatment:

(1)     September 23, 2003: Intake Medical Screening. No dental problems. Has approx 1-inch cut over left eye, he states he got in a fight on Sunday. Has stitches and they are to be removed on September 27, 2003.  No overt redness/drainage. No signs of infection presently. He was instructed to contact medical if any problems arise.

(Docket Entry No. 29, Defendants' Motion for Summary Judgment, Ex. B, p. 8).

(2)     September 24, 2003: Dental Services Record, in-processing examination.

Periodontal type II.  Missing six teeth on top and four on bottom.

(*Id.*, Ex. B, p. 9).

(3)     September 25, 2003: Dental Health Record. Sick-call complaining of

toothache; will lay in.

(*Id.*, Ex. B, p. 39).

(4)     September 26, 2003: 0818 S:[1] toothache, points to upper right quadrant

("URQ") and lower right quadrant ("LRQ"). O: multiple carious and

periodontally involved teeth. A: hopeless # 2, 3, 4, 5, 6, 26, 27, 29, 30, 31. r:

exam. Check med hx and pain. Rx:[2] ibu 600 mg. TID[3] x 14 days, KOP. RTC.[4]

(*Id.*, Ex. B, p. 39).

(5)     September 26, 2003: 0822 hrs Clinic notes. Dental pain. Rx ibuprofen 600 mg

1 TID x 14 days. KOP. W.R. COLLIER, DDS

---

[1] Many medical offices use the SOAP note format to standardize medical evaluation entries made in clinical records. The SOAP note is written to improve communication among all those caring for the patient to display the assessment, problems and plans in an organized format. SOAP is an acronym. The letters S-O-A-P stand for SUBJECTIVE, OBJECTIVE, ASSESSMENT and PLAN. SOAP notes facilitate better medical care when used in the patient's record for review and quality control. *See* www.medicalassistant.net.

[2] "RX" means treatment or prescription.

[3] "Tid" means three times a day.

[4] "RTC" means return to clinic.

(*Id.*, Ex. B, p. 11).

(6)     October 16, 2003: 1010 Sick-call request refill of medications. Will lay in.

(*Id.,* Ex. B, p. 39).

(7)     October 17, 2003: 1430 No show for dental lay-in.

(*Id.*, Ex. B, p. 39).

(8)     October 20, 2003: 0930 sick-call stating that he wants teeth pulled. On the list.

Will lay in. medical refill. Patient presents for tooth extraction (at 1200 hrs).

diagnosis: hopeless 2,3,4,5,6 due to perio/caries. Treatment: bp 120/80,

informed consent obtained. Return for multiple extractions. Rx ibu 800 mg

stat, then 1 tab TID x 8 days. D. STELTON, M.D.

(*Id.*, Ex. B, p. 39).

(9)     October 20, 2003: Consent to Surgical/Invasive Procedure. Decayed or

abscessed tooth or teeth (2,3,4,5,6). Impacted tooth or teeth. Tissue growth.

Irregular bony contour of the alveolus and/or jaw bone. Abnormal or

pathological tissue growth. Extraction of teeth 2, 3, 4, 5, 6. informed consent

signed by HUFFMAN.

(*Id.*, Ex. B, p. 23).

(10)    October 20, 2003: 1345 Dental post-op pain. Rx ibuprofen 800 mg. 1 tablet po.

Stat. then 1 tablet TID x 8 days. KOP. D. STELTON, M.D.

(*Id.*, Ex. B, p. 25).

(11)   January 21, 2004: 0810 S: pain UL. O: exam, multiple mobile, carious teeth. #14 symp. A: #14 same. #16. p: ext #14, 16. consent obtained, PSI given. Ibuprofen

(*Id.,* Ex. B, p. 39).

(12)   January 20, 2004: Sick call request. Wants dental follow-up. Referred to dentist. J. LEGGETT, LVN

(*Id.,* Ex. B, p. 36).

(13)   January 21, 2004: Informed Consent for dental services. Extractions of #14, 16. signed by HUFFMAN.

(*Id.*, Ex. B, p. 37).

(14)   February 5, 2004: Informed consent. Extraction of # 23, 24, 25, 26, 27.

(*Id.*, Ex. B, p. 39).

(15)   February 24, 2004: 0910 Dental health situation reviewed. P2 needs. Pt wants to wait. RTC w/ SC.

(*Id.*, Ex. B, p. 39).

(16)   May 17, 2004: 0720 Sick-call requesting to T get a few teeth pulled. Reply: scheduled for dental SC.

(*Id.*, Ex. B, p. 43).

(17)   May 17, 2004: 1020 S: pain. O: exam. Currently has "cold. #11 F caries, perio

prob. No P1 needs. #20, 21 non-restorable.

(*Id.,* Ex. B, p. 43).

(18)   May 24, 2004: 1720 Nursing Assessment Protocol for EENT complaints.

(*Id.*, Ex. B, p. 41).

(19)   May 27, 2004: Informed Consent for extraction of teeth # 29, 30, 31.

CHARLES BOATNER, DDS

(*Id.,* Ex. B, p. 42).

(20)   June 10, 2004: 0745 Consult. Asymp. Only teeth are functional. 5 year

sentence. Policy rev. to make SC if become a problem. CHARLES BOATNER,

DDS

(*Id.,* Ex. B, p. 43).

(21)   September 9, 2004: SCR. I would like an update on my teeth. I'm waiting to

get the rest of my teeth pulled to get some more. Response: s/c exam.

(*Id.*, Ex. C, p. 3).

(22)   November 12, 2004: SCR. I would like for you to pull 2 of my teeth cause I'm

not able to eat w/ them and I have been having problems chewing with them.

Response: s/c exam.

(*Id.*, Ex. C, p. 4).

(23)   January 3, 2005: SCR. "Could I please get an appointment with a dentist to get a bad tooth pulled?" response: schedule s/c.

(*Id.*, Ex. C, p. 5).

(24)   January 4, 2005: 0755 Dental Health Record. Sick Call Exam. S: SCR states tooth needs to be pulled. Pt states he wants to talk about having dentures made. O: pat has teeth 12, 13, 22 remaining. Hygiene poor. A: pt is essentially edentulous. BMI is 25. p: exam, medical history reviewed. I explained to patient the policy concerning missing teeth replacements. Does not meet criteria based on medical necessity. Pt would like to have the remaining 3 teeth pulled as he figures he can chew better w/o them. I agreed to extract remaining teeth with the understanding that they would not be replaced. RTC ext. 12, 13, JERRY TOOLE, DDS

(*Id.,* Ex. C, p. 7).

(25)   January 20, 2005: Sick call request. Please schedule me to pull my teeth ASAP. They are bothering me very bad. I can't eat with them the way they are. Response: schedule S/C.

(*Id.,* Ex. C, p. 8).

(26)   January 21, 2005: 0728 Dental Health Record. Sick Call Exam. S: SCR states toothache. In clinic patient states he does not have a toothache but was not sure

if he was going to be scheduled for his appointment to have his remaining 3
teeth pulled. O: teeth 12, 13, 22 remaining. Hygiene poor, heavy calculus. No
swelling noted today. A: patient has appointment for extractions and is not in
pain. P: exam, medical history reviewed. No treatment needed today. RTC on
schedule for extractions of teeth 12, 13, 22. JERRY TOOLE, DDS.

(*Id.,* Ex. C, p. 9).

(27)    January 25, 2005: 0840 Dental Health Record. oral surgery. simple extraction.
S: pt appointed for extractions 12, 13. O: medical hx reviewed, no changes. Pt
consents to extraction due to clinical and current radiographic findings indicate
bone loss and patient's request. A: nonrestorable bone loss. P: tx provided, chx
pre-rinse, 1 carpules carbacaine. Consent form signed and patient verbalized
understanding. Radiographs reviewed. Extraction of tooth # 12, 13. good
hemostasis. Verbal and written post-op instructions given. Patient stated he did
not want a lay-in. RTC = extraction #22. JERRY TOOLE, DDS

(*Id.,* Ex. C, p. 16).

(28)    April 11, 2005: Sick call request. Please send me a lay-in to have my tooth
removed by the dentist. Response: schedule S/C

(*Id.,* Ex. C, p. 25).

(29)    April 12, 2005: 0738 Dental Health Record.  Sick Call Exam. S: c/o wants tooth pulled. Points to # 22. o: past medical history reviewed, no changes. Pt consents to extraction due to clinical and current radiographic findings indicate: needs last tooth pulled. A: pt has only one remaining natural tooth. P: chx pre-rinse, 1 carpule carbacaine. Consent form signed and patient verbalized understanding of possible consequences of treatment provided. Radiograph reviewed. Extraction of tooth # 22. good hemostasis. Verbal and written post-op instructions given. 10 packs of ibuprofen 400 mg each. RTC = via scr. JERRY TOOLE, DDS

(*Id.*, Ex. C, p. 26).

(30)    May 27, 2006: Sick call request. I have had severe stomach pains. My digestive system is in an uproar. Please see me ASAP.

(*Id.,* Ex. C, p. 94).

(31)    May 28, 2006: 1416 Nursing Protocol for Upper GI Sx. Inmate to clinic w/ stomach pains after eating and sometimes in a.m. states he has no teeth so cannot chew food and thinks this may be the problem. No changes in BM, has been having problem for about 1 week. O: inmate has no teeth, points to epigastric stomach, no abdominal tenderness at this time to palpation; no

rebound tenderness, bowel sounds in four quadrants. p: place NSCS if not improved. Bismuth subsalicylate. MICHAEL AUSTIN, RN

(*Id.,* Ex. C, pp. 95-96).

(32)  May 31, 2006: Sick call request. Please lay me in for a follow-up. I went to a nurse's sick call on May 28, 2006 and was told they couldn't do anything for me except give me antacids. That has not solved my problem. I still cannot chew my food.

(*Id.,* Ex. C, p. 97).

(33)  June 1, 2006: 1202 MLP notes. S: dental referral. Edentulous. Unhappy. Complaint of unable to chew food adequately. O: weight unchanged since 2004. no acute process identified. A: as above. P: medical intervention not indicated. LLOYD ASCHBERGER, PA

(*Id.,* Ex. C, p. 98).

(34)  July 16, 2006: Sick call request. Please lay me in for a follow up. I don't have any teeth. They were all pulled out by dental in order to provide me with dentures. When they were all pulled, I was denied dentures. Since they were pulled, I am having problems chewing, swallowing and digesting my food. Furthermore, I am getting terrible headaches trying to chew food. Please please

help me in getting denture plates, it is a medical problem. Response: you are

scheduled.

(*Id.,* Ex. C, p. 99).

(35)   July 18, 2006: 0645 Dental Health Record. S: wanting dentures. O: exam, IM,

edentulous. A: prosth. Not medically indicated. IM has a bmi of 24. p: RTC

prn[5] scr w/ R. TOOLE, P5. DENNIS JOHNSON, DDS

(*Id.,* Ex. C, p. 100).

(36)   July 16, 2008: Sick call request. I need to see about getting my teeth.

Response: appointment made.

(*Id.,* Ex. B, p. 44).

(37)   February 19, 2008: 0950 Dental Health Record.  Sick Call Exam. S: SCR. Pt

c/o need to see about teeth. O: med history reviewed, no changes noted. Pt

edentulous. BMI of 24. says can eat food fine. (weight 188, 74"). A: does not

meet requirements for prosthetics. Verbally refuses blended diet. P: SC exam.

RTC prn per SCR. MARK MAHAFFEY, DDS

(*Id.,* Ex. B, p. 50).

(38)   April 11, 2008: Sick-call request,  Ears have been bothering him. Wants to

have them cleaned out.

---

[5]      "Prn" means as needed.

(*Id.*, Ex. B, p. 52).

(39)   April 14, 2008: 0903 Nursing Protocol for EENT. Left ear pain only, but when

ears examined by provider, he asked for cream for dry skin. Seasonal allergies.

Amoxicillin 500 mg po TID x 10 days, KOP. Come to medical @ 10 a.m. till

KOP comes in. expires April 24, 2008. 1st dose given. LINDA BUCKLEW,

LVN; K. KING NP.

(*Id.*, Ex. B, pp. 53, 56).

Although the Court must consider the evidence with all reasonable inferences

in the light most favorable to Huffman, the non-movant, Huffman, must produce

specific facts to demonstrate that a genuine issue exists for trial. *Webb v.

Cardiothoracic Surgery Associates of North Texas,* 139 F.3d 532, 536 (5th Cir.

1998).   Huffman must go beyond the pleadings and use affidavits, depositions,

interrogatory responses, admissions, or other evidence to establish a genuine issue.

*Id.*  The mere existence of a scintilla of evidence in support of Huffman's position is

insufficient to defeat a properly supported motion for summary judgment. *Anderson

v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).   Two opposing conclusory affidavits

do not preclude summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7

F.3d 1203, 1207 (5th Cir. 1993).

The summary judgment record does not raise a fact issue as to deliberate indifference to dental needs.  The facts Huffman alleges as to the treatment he received preclude a finding that the dental care provided violated his constitutional rights.  Huffman's allegations show that medical personnel monitored his condition, examined him on numerous occasions, and responded with medication and treatment. He made repeated requests for his teeth to be pulled because they were bothering him and he was having trouble chewing.  Dr. Toole examined Huffman, determined that the teeth could not be restored, and extracted the teeth.  On January 4, 2005, Dr. Toole explained to Huffman that he did not meet the criteria for receiving dentures. Huffman still consented to the extractions.  Again in July 2006 and February 2008, dental personnel responded to Huffman's requests for dentures.  Based on Huffman's BMI, dental personnel determined that Huffman did not meet the requirements for receiving dentures.   To the extent he complains that he did not receive more aggressive, earlier, or different treatment, such complaints are, as a matter of law, inadequate to support a deliberate indifference showing.

Huffman has offered no evidence showing that Dr. Toole knew of and disregarded an excessive risk to Huffman's health or safety.  Huffman has not established that Dr. Toole was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that Dr. Toole drew that

inference. Dr. Toole has established his entitlement to qualified immunity. Huffman has failed to come forward with any evidence, as is his burden, that there exist genuine issues of material fact as to whether Dr. Toole's conduct rose to the level of a constitutional violation. *See Pierce v. Smith,* 117 F.3d 866, 871-72 (5th Cir. 1997). Dr. Toole is entitled to judgment as a matter of law on this claim. The Defendants' motion for summary judgment as to Huffman's claim of deliberate indifference to his serious medical needs is GRANTED.

## V.    Claims Based on Respondeat Superior

Huffman sues Dr. Linthicum, Director of the TDCJ-CID Health Services Division and Dr. Wells, Dental Director at the University of Texas Medical Branch - Correctional Managed Care ("UTMB-CMC"). Individual liability under section 1983 may not be based on a supervisor's vicarious liability for the acts or omissions of employees. *Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 534 (5th Cir. 1997). Supervisory officials may be liable if their own action or inaction, performed with a certain degree of gross negligence or deliberate indifference, proximately causes a constitutional violation. *Thompson v. Upshur County, Texas,* 245 F.3d 447, 459 (5th Cir. 2001). To establish individual liability for these prison officials, Huffman would have to show either (1) personal involvement in the alleged wrongful acts or (2) that these defendants implemented a policy that resulted in deprivation of Huffman's

constitutional rights. *Cronn v. Buffington*, 150 F.3d 538, 544 (5th Cir. 1998).

The court first considers the issue of personal involvement by these Defendants. Dr. Wells testified as follows:

> I am employed as the Director of Dental Services for UTMB Correctional Managed Care. I have held this position since 1995. I am a dentist in good standing, having been licensed by the Texas State Board of Dental Examiners since 1975. I have worked as a dentist for 33 years. I do not know Billy Wayne Huffman, TDCJ #1188783. I was not involved in his dental care. Other dentists provided Mr. Huffman with his dental care. No one corresponded with me about dentures for Mr. Huffman. I did not know that Mr. Huffman had requested dentures until I was served with a copy of the complaint in this lawsuit.

(Docket Entry No. 29, Defendants' Motion for Summary Judgment, Ex. E, p. 1).

Dr. Linthicum testified as follows:

> I am employed as the Director of the Health Services Division of the Texas Department of Criminal Justice TDCJ). I have held this position since 1998. I am a medical doctor. I am not a dentist. I do not know Billy Wayne Huffman, TDCJ #1188783. I was not involved in his dental care. No one corresponded with me about dentures for Mr. Huffman. I did not know that Mr. Huffman had requested dentures until I was served with a copy of the complaint in this lawsuit.

(Docket Entry No. 29, Defendants' Motion for Summary Judgment, Ex. F, pp. 1-2).

Huffman has not alleged or offered any summary judgment evidence

suggesting that either Dr. Linthicum or Dr. Wells was personally involved in the denial of dental care to him.   Rather, Huffman claims that these Defendants maintained an unconstitutional policy of failing to provide dentures, such policy constituting deliberate indifference to his serious medical need.  A prison official acts with deliberate indifference "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

The summary judgment evidence shows that since September 1, 2003, UTMB Correctional Managed Care (CMC) has maintained a policy that provides dentures for inmates when 'medically necessary.'[6] (Docket Entry No. 29, Defendant's Motion for Summary Judgment, Ex. E, p. 1).   Policy E-36.4 of the Correctional Managed Health Care Policy Manual governs dental prosthodontic services, and provides, in relevant part, as follows: PROCEDURE: Patients whose prosthetic needs are judged to be Medically Necessary should be initiated. To be considered Medically Necessary will require a statement from the patient's physician or Specialty Service (oral

---

[6]Prior to the E36.1 policy change, dentures or partial dentures were provided routinely to patients based on the number of missing teeth and meeting eligibility standards. Full dentures or partial dentures as needed were provided to edentulous or essentially edentulous (no posterior teeth in occlusion) after 6 months incarceration and attaining an acceptable level of oral hygiene if applicable.  Partial dentures were provided after one year to those patients with less than seven occluding posterior teeth and who met the acceptable level of oral hygiene standard. (Docket Entry No. 29, Defendant's Motion for Summary Judgment, Ex. A, Attachment 2, p. 2).

surgery, EENT, plastic or other service) describing the medical need, a statement

from the treating dentist regarding concurrence with the request, the proposed plan

for care, and approval from the Dental Utilization Quality Review Committee.

(Docket Entry No. 29, Defendant's Motion for Summary Judgment, Ex. A,

Attachment 1, p. 1). The Parameter for Care for Medically Necessary Prosthodontics,

dated July 1, 2004 provides as follows:

> Medically Necessary Prosthodontics
> Dental prosthetics are provided when the health of the
> patient would otherwise be adversely affected.  Dentists
> should thoroughly review the patient's medical history.
> Nutritional supervision is a critical component of the
> management of patients with chronic diseases such as heart
> disease, cancer, or diabetes.  Dentists should monitor the
> nutritional status of patients by tracking weight trends for
> those who may have compromised masticatory function. A
> review of the Body Mass Index (BMI) may be utilized as
> a tracking methodology.  The BMI is located on the EMR.
> At the bottom of the vitals screen height and weight can be
> entered and the BMI is automatically calculated. The
> History button on the vitals screen can be utilized to view,
> print or graph the BMI record for the patient. A BMI from
> 18.5 to 25 is considered normal. Patients with a BMI of 25
> or lower which is trending downward or a patient 10% or
> more underweight relative to their ideal body weight
> should be referred to the patient's treating physician for
> consultation.  If the patient's physician determines that the
> patient's nutritional status is compromised, special diets
> such as a mechanically blended diet should be considered.
> Dental prostheses for those patients with compromised
> masticatory function should also be considered following
> initiation and follow-up evaluation of the effectiveness of

the special diet. Dental prostheses should also be considered for a variety of conditions when indicated including but not limited to
• An obturator when used in conjunction with maxillo—facial reconstruction
• Treatment for tempero-mandibular joint dysfunction
• Treatment of certain gastrointestinal diseases in which the inability to chew food may adversely affect the patient's condition.
It should be kept in mind, however, that most foods are quite easily digested with minimal mastication and there is little likelihood that dentures will ameliorate pre-existing gastro-intestinal problems according to current dental literature. Provision of a prosthesis requires an acceptable level of oral hygiene for those with remaining dentition and be approved by the Dental Utilization Quality Review Committee. Submissions to the Committee require a completed Medically Necessary Prosthetics Referral Form. Policy and Procedure E36.5 Dental Utilization Quality Review Committee should be reviewed for other case submission requirements.

(Docket Entry No. 29, Defendant's Motion for Summary Judgment, Ex. A, Attachment 2, pp. 3-4). The summary judgment evidence shows that Huffman sought dental care on September 25, 2003, just a few days after entering prison, complaining of a toothache. (Docket Entry No. 29, Defendants' Motion for Summary Judgment, Ex. D, p. 3). At that time, Huffman weighed 164 pounds and his height was 74 inches. This gave Huffman a Body Mass Index, or BMI, of 21 which is the middle of a normal weight range. (*Id.*). Of his remaining teeth, ten were found to be badly decayed and to have periodontal disease. All of Mr. Huffman's complaints of

oral pain were related to hopelessly decayed and/or loose teeth. These complaints were addressed by definitive treatment when the remaining hopeless teeth were removed, and Huffman was given analgesics. No further treatment was indicated. Huffman began to gain weight after getting his painful decayed and loose teeth removed. The latest document dated February 19, 2008 showed Huffman's weight to be 188 pounds, giving him a BMI of 24, which was on the heavy side of normal. Dr. Toole determined not to provide dentures based upon his evaluation of the condition of the patient. In accordance with CMC policy, he determined that no medical necessity existed. Huffman's medical record revealed that the medical and dental personnel never determined that dentures were a medical necessity for Huffman. Medical and dental personnel explained the dental policy regarding dentures to Huffman more than once before all his teeth were removed. Medical personnel never initiated a treatment plan or promised Huffman dentures or partials. Multiple dentists, nurses, physician's assistants, and physicians evaluated Huffman, but none diagnosed any medical condition requiring treatment by dentures. No medical personnel ever submitted a request for Medically Necessary Removable Prosthetics. (Docket Entry No. 29, Defendants' Motion for Summary Judgment, Ex. D, p. 3). Huffman verbally refused a mechanically blended diet which would have provided his nutritional needs with no chewing required. This suggested that

Huffman knew he could choose foods from the cafeteria line to meet his nutritional needs. Huffman's weight has remained within his normal weight range and was on the heavy side of normal.

In his affidavit, Dr. Tucker testified that:

> The Correctional Managed Care policy on the availability of dental prosthodontics (dentures and partial dentures) for TDCJ inmates is that the prosthodontics are provided when they are medically necessary, *i.e*, for inmates who have a documented medical need for a dental prosthesis. Any dentist or physician determining that an inmate has a special need may submit a request for the prosthodontics. That request will be evaluated by the CMC Dental Utilization Review Committee." Further, "dental policies provide a reasonable process, with multiple levels of appeal, for requesting the consideration of individual patients' conditions and needs for the provision of prosthetics when medically necessary."

(Docket Entry No. 29, Defendants' Motion for Summary Judgment, Ex. D, pp. 2-3).

As noted, a supervisor may be held liable if he is either personally involved in the constitutional deprivation or there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Alton v. Texas A & M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999);*Thompkins,* 828 F.2d at 304. To prevail against a supervisory official, the plaintiff must demonstrate that the official's act, or failure to act, either caused or was the moving force behind the plaintiff's harm. *Smith v. Brenoettsy,* 158 F.3d 908, 911 (5th Cir. 1998). The supervisor's conduct

must be measured against the standard of deliberate indifference. *Alton*, 168 F.3d at 200.  "For an official to act with deliberate indifference, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Brenoettsy,* 158 F.3d at 911.  "The standard of deliberate indifference is high."  *Id.* (citing *Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 218 (5th Cir. 1998)).  Huffman does not allege that Dr. Linthicum and Dr. Wells were aware of and disregarded a substantial risk to Huffman's safety.  Huffman has not established that Dr. Linthicum and Dr. Wells implemented a policy so deficient that the policy itself acted as a deprivation of constitutional rights. *Cronn,* 150 F.3d at 544.  Huffman has not shown there is a sufficient causal connection between the acts of Dr. Linthicum and Dr. Wells, and the constitutional violation sought to be redressed.  The claims against Dr. Wells and Dr. Linthicum are dismissed.

## VI.    The Remaining Claims

Suits for damages against the state are barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).  Absent waiver, neither a state nor agencies acting under its control are subject to suit in federal court.  *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993).  This bar remains in effect when state officials are sued for damages in their official

capacity. *Cory v. White*, 457 U.S. 85, 90 (1982). To the extent Huffman sues Dr. Linthicum, Dr. Wells, and Dr. Toole for damages in their official capacities, those claims are barred by the Eleventh Amendment.

The Eleventh Amendment does not bar Huffman's claim for prospective relief. Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's "policy or custom" must have played a part in the violation of federal law. *Hafer v. Melo*, 502 U.S. 21, 25 (1991)(quoting *Monell v. Dept. of Social Servs. of New York*, 436 U.S. 658, 694 (1978)).

Huffman indicates that he was released on parole on November 19, 2008. (Docket Entry No. 32). Unless he can show either a demonstrated probability or a reasonable expectation that he will be transferred back to the facility, Huffman's release from the TDCJ-CID renders his claims for injunctive relief moot. *See Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)); *Wallace v. Texas Tech University*, 80 F.3d 1042, 1047 n. 3 (5th Cir. 1996) (noting that "[j]urisdiction over a plaintiff's claims for future relief is appropriate only if a reasonable likelihood exists that the plaintiff will again be subjected to the allegedly unconstitutional actions"); *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (finding that an inmate's transfer from a detention center to a state correctional institution mooted his Eighth Amendment claims for declaratory

and injunctive relief because any suggestion of a transfer back to the detention center was too speculative to warrant relief). Huffman has neither alleged nor demonstrated that there is a reasonable likelihood that he will be transferred back to the TDCJ-CID. Therefore, Huffman's claims for injunctive relief are dismissed as moot.

Alternatively, Huffman has not demonstrated that a TDCJ-CID policy caused a violation of his constitutional rights. Huffman's claims for injunctive relief lack merit. Defendants are entitled to judgment as a matter of law on this claim.

## VII.  Conclusion

The Defendants' Partial Motion to Dismiss, (Docket Entry No. 24), is GRANTED. The Defendants' motion for summary judgment, (Docket Entry No. 29), is GRANTED. Huffman's motion for extension, (Docket Entry No. 31), is DENIED as moot.

On December 9, 2008, Huffman advised the court that he had been released on parole on November 19, 2008. He also provided the court with his new address. (Docket Entry No. 32). From the pleadings, it appears that Huffman was released from the custody of the TDCJ-CID. The § 1915 filing fee requirement applies to Huffman because he filed the complaint while he was a prisoner.[7] *Gay v. Texas*

---

[7] The term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, pretrial release, or diversionary program. 28 U.S.C. § 1915.

*Department of Correction State Jail Div.*, 117 F.3d 240, 242 (5th Cir. 1997).  That Huffman was released from prison after he filed his complaint is irrelevant.  *Id.*

Huffman must pay $243.00 in monthly installments of $20.00, until the entire filing fee of $250.00 is paid.

The Clerk will provide a copy of this order by regular mail, facsimile transmission, or e-mail to:

(1)     the parties; and

(2)     the TDCJ - Office of the General Counsel, Capitol Station, P.O. Box 13084, Austin, Texas, 78711, Fax: 512-936-2159.

SIGNED at Houston, Texas, on _____January 29_____, 2009.

VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE